```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  8/18/17
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X
                                           :

KAREN BACKUS,                                                  :
                                           :
                                           :
                                Plaintiff,   :
                                             :
                        -against-                           :
                                           :
U3 ADVISORS, INC., et al.,                              :
                                           :
                                 Defendants.   :
                                           :
-------------------------------------------------------- :
                                           X

1:16-cv-8990-GHW

<u>MEMORANDUM OPINION
AND ORDER</u>

GREGORY H. WOODS, United States District Judge:

      In 2014, Plaintiff Karen Backus, a longtime consultant to universities and nonprofits, joined

with Defendants Thomas Lussenhop and Omar Blaik to start a new company, Defendant U3

Advisors, Inc., which was to provide real estate and project management advisory services to

institutional clients.  In this lawsuit, Plaintiff brings a number of claims directly and derivatively

against Blaik, Lussenhop and U3 Ventures, LLC, a separate company of which Blaik and Lussenhop

are the sole members.  Plaintiff alleges principally that Blaik, Lussenhop and U3 Advisors breached

an agreement to repurchase her shares in the company, and that Blaik, Lussenhop and U3 Ventures

unlawfully diverted resources from U3 Advisors to U3 Ventures.

      Because the unambiguous terms of the stockholder agreement on which Plaintiff sues do

not require repurchase of her shares, her claims seeking repurchase are dismissed.  Plaintiff has not

sufficiently pleaded her fraudulent inducement, conversion or waste claims, and has not complied

with the procedure for bringing her derivative claim against Blaik and Lussenhop, which alleges that

they breached a contractual obligation to devote all of their time to U3 Advisors.  U3 Ventures must

also be dismissed from this case for lack of personal jurisdiction.  The Court finds, however, that

Plaintiff has stated a claim for breach of fiduciary duty against Blaik and Lussenhop, although supplemental briefing will be ordered as to whether this claim may be brought directly, as opposed to derivatively.  Accordingly, Defendants' motion to dismiss is GRANTED in part and DENIED in part.  The Court grants Plaintiff leave to file an amended complaint, except as to her claims for repurchase of her shares and conversion (Counts One, Four and Seven), which are being dismissed with prejudice.

## I.    BACKGROUND[1]

Since at least 1996, Plaintiff Karen Backus has made her career providing advisory and project management services to universities and nonprofit organizations.  Amended Verified Complaint (Dkt. No. 17) (the "complaint" or "Compl.") ¶ 13.  In 2012, she began exploring plans for her gradual retirement over the coming years, and sought to "transition her ownership interest" in K. Backus & Associates ("KBA"), the entity through which she had conducted her business since 1998, "to a successor entity or other interested party."  *Id.* ¶ 14.  Through KBA, Plaintiff served as an "advisor to some of the more prominent universities and nonprofit organizations throughout the United States."  *Id.*

In late 2012 and 2013, Plaintiff met with Defendant Omar Blaik to discuss the formation of a new company, based upon the acquisition of KBA by Blaik's business and/or the merging of KBA with Blaik's business.  *Id.* ¶ 15.  The new company would provide real estate and project management advisory services to universities, foundations, and nonprofit organizations.  *Id.*  On January 1, 2014, Plaintiff, Blaik and Defendant Thomas Lussenhop "combined the respective resources from their companies" and formed a new company called U3 Advisors, Inc.  *Id.* ¶ 20.  In addition to being a co-founder of U3 Advisors, Plaintiff is a principal of the company and its former

---

[1] Unless otherwise noted, the facts are taken from the amended complaint and are accepted as true for the purposes of this motion.  *See, e.g., Carlin v. Davidson Fink LLP*, 852 F.3d 207, 212 (2d Cir. 2017).

chief executive officer.  *Id.* ¶ 7.

### A.  Agreement to Purchase Plaintiff's Shares in U3 Advisors, Inc.

The respective ownership interests of Plaintiff, Blaik and Lussenhop was memorialized in the Stockholder Agreement of U3 Advisors, Inc., dated January 1, 2014 (the "Stockholder Agreement").  *Id.* ¶ 21.  Plaintiff received 42% of the outstanding shares, Blaik received 48% of the shares, and Lussenhop received 10% of the shares.  *Id.* ¶ 16.  Backus later agreed to sell two of her shares to Lussenhop, reducing her interest to 40% and increasing his interest to 12%.  *Id.*  Blaik also later came to acquire Lussenhop's shares, and as a result held a 60% interest in U3 Advisors.  *Id.* ¶ 24.

In order to "induce [Plaintiff] to enter into this relationship, and as the basis for the bargain," Blaik and Lussenhop agreed with Plaintiff that "in exchange for obtaining the financial benefit" of her clientele and employees, "they would effectuate her retirement over a five-year period by having the new company:  (1) buy 5% of [her] initial 40% interest annually for four years . . . and (2) purchase the remaining 20% of [her] interest . . . thereafter upon her decision to retire."  *Id.* ¶ 3.  Further, Plaintiff "advised Blaik and Lussenhop that one of the conditions for her joining the new company was that a portion of her shares had to be repurchased each year by the new company so as to allow her to retire, if she chose, in four years."  *Id.* ¶ 17.  Blaik and Lussenhop agreed that the new company would purchase 5% of her shares per year for each of the first four years, providing for the transfer of 20% of Plaintiff's 40% interest.  *Id.* ¶ 18.  Blaik and Lussenhop "acknowledged" that this annual share repurchase was a "critical condition" of Plaintiff's decision to join the new company and "that she would not have joined the new company if they had not agreed to this condition."  *Id.* ¶ 19.  In addition, with respect to Plaintiff's retirement plans, the Stockholder Agreement stated:  "The Company and the Stockholders acknowledge that Karen may retire at any time after the 4th anniversary of the effective date (January 1, 2014)."  Stockholder Agreement,

Article 6(c) (annexed as Ex. 1 to Compl.).

The complaint also alleges that the "Stockholder Agreement also memorialized the agreement that Backus would sell and U3 Advisors would purchase 5% of her outstanding shares each year for the calendar years 2014 through 2018." Compl. ¶ 30. Article 3(b) of the Stockholder Agreement is the centerpoint of Plaintiff's contractual claim. She asserts that pursuant to that provision of the contract, U3 Advisors "was required to purchase . . . five (5) shares each year of the stock held by Backus." *Id.* ¶ 54. Article 3(b) provides:

> During calendar years 2014-2018, Karen agrees to sell her Shares to the Company, for a price per Share equal to the Agreed Share Value as then in effect, payable at a lump sum at closing, on demand by the Company so that the Company may make those Shares available for purchase under the ESP [employee stock purchase plan] as contemplated by Section 3(a), but Karen will not be required under this Article 3(b) to sell to the Company Shares that represent more than 5% of the total issued and outstanding Shares of the Company in any given calendar year.

Although not cited in the complaint, the Stockholder Agreement contains several additional provisions regarding the acquisition of shares by the company to be made available for purchase under the ESP. Notably, Article 5(c) of the agreement provides that "unanimous board approval" will be required to, among other things, "[c]aus[e] the company to adopt an ESP" as well as "to purchase Shares from Karen pursuant to Section 3(b)."

The complaint alleges that the "shares were to be purchased at the 'Agreed Share Value' set forth in the Stockholder Agreement . . . ." Complaint ¶ 30. Pursuant to the Stockholder Agreement, the "Agreed Company Value" was an amount defined as being equal to the gross revenues of the company for the fiscal year, net of reimbursed income, bad debts, and sales discounts during the fiscal year. *Id.* ¶ 26. The Stockholder Agreement also defined the "Agreed Share Value" as being equal to the Agreed Company Value divided by the number of outstanding shares of U3 Advisors. *Id.* ¶ 27. During the calendar years of 2014 and 2015, the U3 Advisors gross revenues less reimbursed incomes, bad debts and sales discounts, exceeded $4,000,000 for each year,

4

resulting in an Agreed Share Value of $40,000 for 2014 and $50,000 for 2015. *Id.* ¶ 32. Article 5(c) of the Stockholder Agreement requires unanimous board approval for "altering the methodology for computing Agreed Company Value." *Id.* ¶ 28. At no time since the relevant parties entered into the Stockholder Agreement has there been unanimous board approval to alter the Agreed Company Value. *Id.* ¶ 29.

Plaintiff has made "repeated requests and demands" for "U3 Advisors to honor its obligations to purchase her shares under the Stockholder Agreement," but "U3 Advisors, Blaik, and Lussenhop have denied all requests and refused to carry out the required annual purchase of [Plaintiff's] shares for the calendar years 2014 through 2016." *Id.* ¶ 34. In addition, Blaik and U3 Advisors "have attempted to force Backus to now accept less than the Agreed Share Value formula set in 2014." *Id.* ¶ 35. To that end, in January 2016, "Blaik, Lussenhop and U3 Advisors" attempted to amend the Stockholder Agreement "for the sole purpose of changing the methodology for calculating Agreed Share Value so as to now depress the value of the Backus shares to less than 30% of the value calculated in the methodology agreed upon by all Parties in 2014." *Id.* ¶ 36.

### B. "Diversion and Depletion" of U3 Advisors' Resources

In addition to the allegations regarding the alleged failure of Defendants to repurchase Plaintiff's shares, the complaint also contains a set of allegations concerning the alleged "diversion and depletion" of U3 Advisors' resources by Blaik and Lussenhop. This section of the complaint opens with a citation to Article 6(a) of the Stockholder Agreement, which states:

> The Stockholders hereby acknowledge that for at least two years following the Effective Date, all of the Principals are expected to be "Active Principals", meaning that each of them is expected to devote substantially all of their professional time to the Company, and to be involved in the day-to-day business operations and management of the Company.

Compl. ¶ 41. The complaint alleges that Plaintiff has discovered that from 2014 through 2016, Blaik and Lussenhop "diverted resources," including the "allocation of U3 Advisors' staff to perform

unauthorized work" on behalf of a separate company called U3 Ventures, Inc.  *Id.* ¶ 41.  U3

Ventures is a real estate investment fund and developer owned by Blaik and Lussenhop.  *Id.* ¶ 11.

From 2014 to 2016, 16 salaried employees of U3 Advisors worked over 3,018 hours on matters for

U3 Ventures, and Lussenhop, who now works primarily for U3 Ventures, devoted approximately

24% of his time to U3 Ventures during 2014 and 2015.  *Id.* ¶ 42.

The "full value" of the U3 Advisors employee hours "diverted" to U3 Ventures while they

were being compensated by U3 Advisors exceeds $900,000, based on the market billing rate for the

relevant employees.  *Id.*  For example, during 2014, 2015 and 2016, U3 Advisors employees Alex

Feldman, Jamie Flaherty and George Smith worked 178.5, 363 and 103.5 hours, respectively, for U3

Ventures; each had a market billing rate of $300 per hour, meaning that they provided a total market

value of $193,500 in employee hours to U3 Ventures "without a corresponding benefit to U3

Advisors."  *Id.* ¶ 43.  During those years, Plaintiff "devoted her full attention and efforts" to U3

Advisors.  *Id.* ¶ 45.

Blaik remained the 100% owner of U3 Ventures until August 2016, when Lussenhop

received shares of that company.  *Id.* ¶ 44.  Today, Backus and Blaik are the sole shareholders of U3

Advisors.  *Id.* ¶ 46.  Blaik and Lussenhop are the sole shareholders of U3 Ventures.  *Id.*

### C.  "Basis for Derivative Claims"

The complaint alleges that, with respect to the claims Plaintiff asserts derivatively on behalf

of U3 Advisors, Plaintiff is entitled to assert those claims because "she was a shareholder in U3

Advisors at the time of the actions complained of" and that "this action is not a collusive action to

confer jurisdiction that this Court would otherwise lack."  *Id.* ¶ 47.  In addition, the complaint alleges

that Plaintiff "made more than sufficient demand to obtain the desired action sought through the

derivative claims" because "she has sought reimbursement for the depletion and diversion of U3

Advisors' assets to U3 Ventures by Blaik and Lussenhop."  *Id.* ¶ 48.  On July 18, 2015, "after

discovery of the time that U3 Advisors employees had diverted to spend on work for U3 Ventures in 2014 and 2015," Plaintiff wrote to Blaik "to request reimbursement." *Id.* ¶ 49.  In response, on July 19, 2015, Blaik replied in writing as follows:  "I am certain of one thing and that is that I vehemently disagree with your proposal or any suggestion that we have to true up retroactively."  *Id.*

The complaint alleges that, to the extent any further or other demand may have been made, "it is excused as futile" because U3 Advisors did not have an independent and disinterested board of directors.  *Id.* ¶¶ 50-51.  The complaint states that Blaik held a 48% interest in the company until August 2016, when his interest was increased to 60% by acquiring Lussenhop's 12% share, and Plaintiff herself held a 40% interest.  *Id.* ¶ 51.  But the complaint provides no information regarding the individuals comprising the board.

### D.  Procedural Background

Defendants moved to dismiss the complaint in this action on January 4, 2017.  Dkt. No. 13. In lieu of opposing Defendants' motion, Plaintiff filed an amended complaint, on January 25, 2017. Dkt. No. 17.  Defendants thereafter moved to dismiss the amended complaint on February 15, 2017, Dkt. No. 19, Plaintiff opposed the motion on March 18, 2017, Dkt. No. 23, and Defendants replied on March 15, 2017, Dkt. No. 24.

The operative complaint asserts the following causes of action:  1) breach of Stockholder Agreement against U3 Advisors; 2) breach of Stockholder Agreement against Blaik and Lussenhop; 3) diversion and waste against Blaik and Lussenhop; 4) conversion against Blaik, Lussenhop and U3 Ventures; 5) fraud in the inducement against Blaik; 6) breach of fiduciary duty against Blaik and Lussenhop; and 7) declaratory judgment regarding the alleged obligation of U3 Advisors to purchase Plaintiff's shares.  Dkt. No. 17.

## II.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted

as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge" claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). However,

> 'Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' A complaint must therefore contain more than 'naked assertion[s] devoid of further factual enhancement.' Pleadings that contain 'no more than conclusions . . . are not entitled to the assumption of truth' otherwise applicable to complaints in the context of motions to dismiss.

*DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87-88 (2d Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678-79). A complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555, 557).

## III.   DISCUSSION

Defendants have moved to dismiss the complaint in its entirety. The Court addresses each claim asserted in the complaint and Defendants' arguments for the dismissal of each claim in the

order that Defendants address them in their motion to dismiss.

As an initial matter, the Court notes that Plaintiff, in opposing Defendants' motion to dismiss, relies upon evidentiary materials and factual allegations extrinsic to the facts alleged in the complaint. "Because a Rule 12(b)(6) motion challenges the complaint as presented by the plaintiff, taking no account of its basis in evidence, a court adjudicating such a motion may review only a narrow universe of materials." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). Courts generally "do not look beyond 'facts stated on the face of the complaint . . . documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken.'" *Id.* (quoting *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016)). Plaintiff's apparent misunderstanding of the nature of a federal district court's evaluation of a Rule 12(b)(6) motion is also reflected in her criticism of Defendants for "only attaching the Complaint to their motion." Memorandum of Law in Opposition to Motion to Dismiss Amended Complaint (Dkt. No. 22) ("Pl. Opp.") at 20. While courts are to "liberally construe pleadings and briefs submitted by *pro se* litigants . . . reading such submissions to raise the strongest arguments they suggest," *Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007), Plaintiff is represented by counsel in this matter. As a result, in ruling on Defendants' motion under Fed. R. Civ. P. 12(b)(6), the Court has not considered the additional factual allegations contained in Plaintiff's opposition, the exhibits submitted in connection with the opposition, nor the factual assertions contained in the affidavit accompanying Plaintiff's opposition. Rather, the Court has considered only the factual allegations contained in the complaint and the content of the Stockholder Agreement, which was appended to the complaint.

### A. Breach of Stockholder Agreement against U3 Advisors (Count One) and Declaratory Judgment (Count 7)

#### 1. Count One

The first cause of action asserted in the complaint alleges breach of the Stockholder

Agreement against U3 Advisors on the ground that U3 Advisors was required to purchase, at the Agreed Share Value, five shares each year of the stock held by Backus beginning in 2014. This claim relies upon Article 3(b) of the Stockholder Agreement which, according to Plaintiff's interpretation, obligates U3 Advisors to make these repurchases. U3 Advisors moves to dismiss this claim on the ground that the Stockholder Agreement does not require the company to purchase her shares. Because the Court agrees with U3 Advisors that the Stockholder Agreement does not require the company to purchase Plaintiff's shares as she alleges, but rather, grants the company an option to do so, this claim must be dismissed.

The Court will apply Delaware law in adjudicating the motion to dismiss Count One. As Defendants point out, Section 12(b) of the Stockholder Agreement provides: "This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (without regard to conflicts of laws principles)." A federal court sitting in diversity applies the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *see also Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001) ("A federal trial court sitting in diversity jurisdiction must apply the law of the forum state to determine the choice-of-law."). "New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000). In this case, the parties do not dispute that U3 Advisors is a Delaware corporation, and the Court therefore finds it appropriate to look to Delaware law in resolving this particular dispute. *Cf. Stiegmeier v. Northwestern Growth Corp.*, No. 00-cv-6824 (DLC), 2000 WL 1670931, at *2 (S.D.N.Y. Nov. 6, 2000) (applying South Dakota law in a case where the contract provided that it was to be governed by South Dakota law, and the defendant was incorporated in that state). In addition, the parties cite Delaware law in briefing this particular

dispute.  "[I]n the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied." *Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 52 (2d Cir. 1984).  Where "[t]he parties' briefs assume" that a certain body of law controls, "such implied consent is sufficient to establish choice of law." *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000); *accord Fed. Ins. Co. v. Marlyn Nutraceuticals, Inc.*, No. 13-cv-0137 (JS) (ARL), 2013 WL 6796162, at *3 n.7 ("The Court will assume that New York law applies given the parties' briefs.").

"Under Delaware law, the interpretation of a contract is a question of law suitable for determination on a motion to dismiss." *MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455, at *5 (Del. Ch. Dec. 30, 2010).  "When interpreting a contract, the court strives to determine the parties' shared intent, looking first at the relevant document, read as a whole, in order to divine that intent." *Schuss v. Penfield Partners, L.P.*, 2008 WL 2433842, at *6 (Del. Ch. June 13, 2008) (citation and internal quotation marks omitted).  A court must "interpret clear and unambiguous terms according to their ordinary meaning." *GMG Cap. Inv., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012); *see also Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009) ("In interpreting contract language, clear and unambiguous terms are interpreted according to their ordinary and usual meaning.").  "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language," and a contract "is not rendered ambiguous simply because the parties do not agree upon its proper construction." *GMG*, 36 A.3d at 780 (citation omitted).  "Dismissal of a claim based on contract interpretation is proper if the defendants' interpretation is the *only* reasonable construction as a matter of law," and dismissal is appropriate if a plaintiff opposing a motion to dismiss offers an interpretation that "is not a reasonable one." *Caspian Alpha Long Credit Fund, L.P. v. GS Mezzanine Partners 2006 L.P.*, 93 A.3d

1203, 1205 (Del. 2014) (emphasis in original) (citations and internal quotation marks omitted); *see also id.* at 1208 (dismissal is appropriate if "there is no reasonable reading" of the contract that supports the plaintiff's proposed construction).

U3 Advisors too points to Article 3(b) of the Stockholder Agreement in support of its argument that the Stockholder Agreement does not, as Plaintiff alleges, require the company to repurchase her shares. As noted above, that provision of the agreement provides:

> During calendar years 2014-2018, Karen agrees to sell her Shares to the Company, for a price per Share equal to the Agreed Share Value as then in effect, payable at a lump sum at closing, on demand by the Company so that the Company may make those Shares available for purchase under the ESP as contemplated by Section 3(a), but Karen will not be required under this Article 3(b) to sell to the Company Shares that represent more than 5% of the total issued and outstanding Shares of the Company in any given calendar year.

U3 Advisors presents a different interpretation of this provision than that advanced by Plaintiff. U3 Advisors argues that this provision provides the company with an option to repurchase up to five of Plaintiff's shares per year, but that it does "not include a guarantee that the Company will do so, nor does it require Backus with a right to acquire it." Memorandum of Law in Support of Motion to Dismiss the Amended Complaint (Dkt. No. 21) ("Def. Mem.") at 8. Rather, they argue, the Stockholder Agreement "provides the Company with the right to make a demand, not Backus with a right to force the Company to purchase." *Id.* U3 Advisors argues that, at bottom, the "repurchase terms of the Stockholder Agreement are clear and unambiguous, and as a matter of law the terms do not provide Backus with a right to have her shares repurchased." *Id.*

The Court agrees with U3 Advisors that the terms of Article 3(b) of the Stockholder Agreement are clear and unambiguous and must be enforced as written. Under the plain meaning of the terms of the Stockholder Agreement, the company has the right to make a demand that Plaintiff sell her shares. The plain terms of the Stockholder Agreement do not, however, provide Plaintiff with the right to require repurchase by the company by making a similar demand of the company.

Plaintiff's arguments in opposition to U3 Advisors' motion to dismiss this claim are unpersuasive.  The Court first notes that Plaintiff cites no other provision of the Stockholder Agreement, outside Article 3(b), which could be read to give her a right to demand repurchase of her shares by U3 Advisors, nor any provision binding the company to repurchase the shares as an absolute matter.  Instead, she focuses her efforts on persuading the Court to adopt her proposed interpretation of Article 3(b).  Plaintiff argues that Article 3(b) "phrases the repurchase in mandatory not permissive language regarding its occurrence and price."  Pl. Opp. at 11.  In Plaintiff's view, the language "Karen agrees to sell her Shares to the Company" creates a mandatory obligation on the part of U3 Advisors to purchase her shares; and the fact that the provision "makes the timing of each year's sale 'on demand by the company' does not suddenly render performance optional."  *Id.*

The Court rejects Plaintiff's proposed construction of Article 3(b) of the Stockholder Agreement.  The unambiguous terms of this provision, read in its entirety and in the context of the entire Stockholder Agreement, grants U3 Advisors an option, which is a "contract . . . in which there is no obligation on the part of the [optionee] to purchase at all."  *Console Master Speaker Corp. v. Muskegon Wood Prods. Corp.*, 138 A. 598 (Del. 1927); *see also Grynberg v. Burke*, 1981 WL 15118, at *1 (Del. Ch. May 20, 1981) ("An option is an agreement to keep an offer open" and "is a form of contract.") (citations omitted); Black's Law Dictionary (10th Ed. 2014)(defining option as "[t]he right (but not the obligation) to buy or sell a given quantity of securities, commodities, or other assets at a fixed price within a specified time.").  Plaintiff's construction of the language "Karen agrees to sell her Shares" as mandatory as opposed to permissive language with respect to an obligation on the part of U3 Advisors is inconsistent with the text of the provision, and is an unreasonable interpretation which the Court declines to adopt.  *See Caspian Alpha Long Credit Fund*, 93 A.3d at 1205 (noting that the court is not required to accept "strained interpretation proposed by the plaintiff" in reviewing a contract at motion to dismiss stage).  It is unreasonable to construe that

language as imposing an obligation on U3 Advisors to repurchase Plaintiff's shares without also considering the "on demand" language that appears later in that very same sentence. The "on demand" language clearly indicates that U3 Advisors did not also agree to purchase Plaintiff's shares, instead securing for itself the option to do so. This construction is reinforced by the inclusion of the language "but Karen will not be required under this Section 3(b) to sell to the Company Shares that represent more than 5% of the total issued and outstanding Shares of the Company in any given calendar year." This clause places restrictions on Plaintiff's requirement to sell shares to the company, supporting the conclusion that the provision is properly understood as imposing a requirement on Plaintiff to sell, rather than an obligation on the company to buy. In addition, the provision in Article 5(c), which requires unanimous board approval before the company repurchases shares from Plaintiff, supports construing Article 3(b) as creating an option held by U3 Advisors. An automatic repurchase obligation of the sort Plaintiff argues for is inconsistent with a requirement that the board of directors must first unanimously approve any such repurchase.

Plaintiff cites a single out-of-state case in support of her argument that the "on demand" language pertains only to timing, and not to the "fact of a sale's occurrence." Pl. Opp. at 11. In *Robert and Ardis James Foundation v. Meyers*, 48 N.E.3d 442, 448-49 (Mass. 2016), the agreement in question "clearly contemplated sale at some point," but the parties had not reached a mutual understanding about the timing of the sale, and the judge considered whether to supply a term requiring the sale to occur "on demand." That case, which in any event is not binding here, does not stand for the proposition that the inclusion of the phrase "on demand" works to transform an option to purchase into a mandatory purchase obligation under circumstances like those at issue here, where there is a dispute regarding whether the purchase must take place at all. At most, the reasoning of that court supports the proposition that "on demand" can dictate the timing of a sale when the timing is in doubt but the fact that a sale will occur is not.

Finally, the Court rejects Plaintiff's argument that reading Article 3(b) to create an option but not an obligation for U3 Advisors to purchase her shares would render this provision "illusory" because performance would "become entirely optional."  Pl. Opp. at 16.  This result is unacceptable, according to Plaintiff, because she, Blaik, and Lussenhop "negotiated and agreed to the repurchase of Backus' shares as the Agreement's signatories."  *Id.*  This argument is circular since it assumes that the Stockholder Agreement requires repurchase.  The Court has concluded that the Stockholder Agreement does not by its terms require U3 Advisors to repurchase Plaintiff's shares; rather, it grants U3 Advisors an option to do so.  And as noted above, an option is itself a contract; it is therefore not the case that an option is unenforceable simply because the decision whether to exercise it is held by only one party to the contract.  Moreover, as already discussed, the Court cannot and will not consider matters extrinsic to the allegations in the complaint, upon which Plaintiff appears to rely in asserting that she "negotiated and agreed" to have U3 Advisors repurchase her shares.  In any event, even if the Court were to overlook that issue, in assessing what Plaintiff "agreed" to, the Court need only look to the terms of the written contract between the parties, which are in this case unambiguous.  *See, e.g.*, *Galantino v. Baffone*, 46 A.3d 1076, 1081 n.9 (Del. 2012) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties . . . .") (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)).

Plaintiff's proposed interpretation of Article 3(b) as creating an obligation on the part of U3 Advisors to purchase her shares is not a reasonable one; rather, the interpretation proposed by U3 Advisors is the only reasonable one, and dismissal of the claim based upon Article 3(b) is therefore appropriate.  Count One, alleging breach of the Stockholder Agreement against U3 Advisors, is dismissed with prejudice.[2]

_____

[2] Defendants also seek dismissal of Count One on an independent ground—namely, that the Stockholder Agreement

2.    **Count Seven**

U3 Advisors argues that, because Count One of the complaint must be dismissed for failure to state a claim, so too must Count Seven.  Count Seven seeks a declaration that "U3 Advisors is obligated to purchase the Backus shares of stock" as set forth in the complaint.  Compl. ¶ 111. Plaintiff does not meaningfully address the merits of this claim in her opposition.  Indeed, she appears to concede that it must rise or fall with Count One.  *See* Pl. Opp. at 10 ("Defendants are not entitled to dismissal of Backus' first cause of action (breach of contract) or seventh cause of action (declaratory judgment.").  Defendants have not met their burden as movants to prove that they have set forth the only reasonable interpretation and, to the contrary, their interpretation is unreasonable under Delaware law.").  Because Count Seven is based upon the same factual and legal premises as Count One, it must fail for the same reasons.  Accordingly, Count Seven, which seeks a declaratory judgment, is dismissed with prejudice.

### B.  Fraudulent Inducement (Count Five)

Plaintiff brings an additional claim related to the alleged failure of U3 Advisors to repurchase her stock, for fraudulent inducement against Blaik.  The alleged factual basis for this claim is that in September and October of 2013, Blaik "uttered factual misrepresentations to Backus, promising that if she joined him in the formation of a new company and contributed the resources of KBA," the "new company would purchase a portion of [her] shares" during the calendar years 2014 through 2018 to plan for her retirement.  Compl. ¶ 86.  Plaintiff also alleges, more specifically, that on or about September 30, 2013, Blaik told her during a phone call that if she agreed to the initial valuation of U3 Advisors that was ultimately implemented, "Blaik would cause U3 Advisors to

---

requires unanimous approval by the board of directors for the company to purchase shares from Backus in order to make those shares available for purchase under the ESP (*i.e.*, employee stock purchase plan), and Plaintiff has not alleged that the board unanimously approved purchasing her shares.  *See generally Def. Mem.* at 7-8.  Because the Court concludes that dismissal of Count One is warranted on the grounds discussed above, the Court need not address Defendants' alternative argument.

purchase 5% of her shares during each of the first four years of its operation, reducing her ownership interest to 20% by her projected retirement in 2018." *Id.* ¶ 87. Blaik "knew that Backus would not have contributed the resources of KBA and formed U3 Advisors with him if she knew that U3 Advisors would not purchase 5 percent of her shares each year" and his "promises and statements ensuring Backus that her shares would be timely purchased were false when made." *Id.* ¶¶ 88-89. The complaint alleges that Blaik made these statements "with the intent to deceive Backus and to induce her to form U3 Advisors," and that Plaintiff relied on these statements, which she believed to be true, in closing KBA and committing herself and her resources to U3 Advisors. *Id.* ¶¶ 90-91.

Blaik seeks dismissal of this claim on a number of grounds, only one of which the Court addresses, since it is sufficient to resolve the motion to dismiss as to this claim. Because this claim relies upon alleged prior oral promises that are contradicted by the Stockholder Agreement, Plaintiff has not stated a claim for fraudulent inducement. Count Five must accordingly be dismissed.

The Court will apply New York law in resolving the motion to dismiss Count Five. Under New York conflict of law principles, which apply in this diversity case as noted above, "fraud claims are governed by the state in which the injury is deemed to have occurred, which is usually where the plaintiff is located." *Nat'l W. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 89 F. App'x 287, 288 (2d Cir. 2004) (citing *Sack v. Low*, 478 F.2d 360, 366 (2d Cir. 193)); *accord Oliver Wyman, Inc. v. Eielson*, No. 15-cv-5305 (RJS), 2016 WL 5339549, at *4 (S.D.N.Y. Sept. 22, 2016). Here, because the complaint alleges that Plaintiff is a resident of New York, Compl. ¶ 7, New York law applies. The Court would also apply New York law in resolving this particular claim in light of the parties' consent to the application of that law through their reliance on New York law in briefing this issue.

Under New York law, a plaintiff alleging fraud must plead the following elements: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity

(3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006). Fraudulent inducement is a "type of fraud" which "arises from a promisor's successful attempts to induce a promisee to enter into a contractual relationship despite the fact that the promisor harbored an undisclosed intention not to perform under the contract." *Oliver Wyman,* 2016 WL 5339549, at *5 (quoting *Barrie House Coffee Co., Inc. v. Teampac, LLC*, No. 13-cv-8230 (VB), 2016 WL 3645199, at *7 (S.D.N.Y June 30, 2016)). A claim for fraudulent inducement, therefore, "must satisfy the same elements" as a claim for fraud. *Commoli v. Huntington Learning Centers, Inc.*, 117 F. Supp. 3d 343, 349 (S.D.N.Y. June 25, 2015) (citing *Urstadt Biddle Props., Inc. v. Excelsior Realty Corp.,* 65 A.D.3d 1135, 1136-37 (2d Dep't 2009) ("The elements of a cause of action alleging fraud in the inducement are representation of a material existing fact, falsity, scienter, reliance, and injury.")). A claim of fraudulent inducement is also subject to the heightened pleading standard of Fed. R. Civ. P. 9(b), which requires that a party "state with particularity the circumstances constituting fraud or mistake." *See, e.g.*, *Ningbo Prods. Import & Export Co. v. Eliau*, No. 11-cv-650 (PKC), 2011 WL 5142756, at *4 (S.D.N.Y. Oct. 31, 2011); *Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 254-55 (S.D.N.Y. 2011). "This means the who, what, when, where, and how: the first paragraph of any newspaper story." *Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 39 F. Supp. 3d 516, 520 (S.D.N.Y. 2014) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)).

Plaintiff's fraudulent inducement claim is based on her allegation that Blaik told her that "Blaik would cause U3 Advisors to purchase 5% of her shares during each of the first four years of its operation, reducing her ownership interest to 20% by her projected retirement in 2018." Compl. ¶ 87. Plaintiff cannot show justifiable reliance on Blaik's alleged misrepresentation, as a matter of law. "Although reasonable reliance is a fact-specific inquiry generally considered inappropriate for determination on a motion to dismiss, whether a plaintiff has adequately pleaded justifiable reliance

can be a proper subject for a motion to dismiss in certain circumstances." *Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 459 (S.D.N.Y. July 26, 2007) (quoting *Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*, No. 03-cv-3478 (DAB), 2006 WL 278138, at *8 (S.D.N.Y. Feb. 2, 2006)). "Under New York law, reasonable reliance is precluded when 'an express provision in a written contract contradicts a prior alleged oral representation in a meaningful fashion.'" *Colonial Funding Network, Inc. for TVT Cap., LLC v. Espazz, Inc.*, --- F. Supp. 3d ----, 2017 WL 1944125, at *6 (S.D.N.Y. May 9, 2017) (quoting *Republic Nat'l Bank v. Hales*, 75 F. Supp. 2d 300, 315 (S.D.N.Y. 1999)); *see also Stone v. Schulz*, 231 A.D.2d 707, 707-08 (2d Dep't 1996) ("Where, as here, there is a 'meaningful' conflict between an express provision in a written contract and a prior alleged oral representation, the conflict negates a claim of reasonable reliance upon the oral representation."); *Bango v. Naughton,* 184 A.D.2d 961, 963 (3d Dep't 1992) ("[C]onflict between the provisions of the written contract and oral representations negates the claim of reliance upon the latter."). Plaintiff— a sophisticated businessperson who ran her own company for 16 years, and a principal and former CEO of U3 Advisors—could not have reasonably relied on Blaik's alleged oral representation that he would cause U3 Advisors to purchase her shares. Upon formation of U3 Advisors on or about January 1, 2014, Blaik became only a 42% shareholder in U3 Advisors, with the remaining shares held by Plaintiff and Lussenhop. As has been discussed, Article 5(c)(iv) of the Stockholder Agreement requires "unanimous board approval" to purchase shares from Plaintiff. Even assuming that a shareholder in U3 Advisors retains voting power in proportion to his or her share ownership, there is a meaningful conflict between Blaik's alleged promise to "cause U3 Advisors" to purchase Plaintiff's shares, where any such purchases would require unanimous board approval. Accordingly, Count Five, alleging fraudulent inducement, is dismissed without prejudice.

## C.  Conversion (Count Four)

Plaintiff's fourth cause of action relates to the alleged improper work that Blaik, Lussenhop,

and several other employees of U3 Advisors performed for U3 Ventures while they were employed by U3 Advisors.  The basis for this claim, which is brought against Blaik, Lussenhop and U3 Ventures, is that "from 2014 through 2016 Blaik and Lussenhop wrongfully diverted U3 Advisors' resources by directing its employees to work on matters for the benefit of his [sic] own unrelated company, U3 Ventures."  Compl. ¶ 80.  Through this diversion of resources, "Blaik, Lussenhop and U3 Ventures improperly converted and retained the resources and assets of U3 Advisors."  *Id.* ¶ 81.  As noted above, the complaint alleges that the "full value of the U3 Advisors employee hours diverted to U3 Ventures . . . is believed to exceed $900,000, based on the market billing rate" for the relevant employees, taking into account the number of hours that they worked for U3 Ventures.  *Id.* ¶ 42; *see also id.* ¶ 83 ("As a result of Blaik's, Lussenhop's and U3 Ventures' wrongful use and conversion of U3 Advisors' resources, Backus and the shareholders of U3 Advisors have been damaged in an amount . . . believed to exceed $900,000.").  Defendants move to dismiss this claim on the ground that these allegations are insufficient as a matter of law because they "do not concern tangible property or intangible property rights merged into a document such as a stock certificate."  Def. Mem. at 12.  Because the facts Plaintiff alleges do not allege the wrongful exercise of dominion over specific identifiable property, her conversion claim fails and must be dismissed.[3]

### 1.     Personal Jurisdiction over U3 Ventures

Plaintiff's conversion claim is the only cause of action in the complaint brought against U3 Ventures.  U3 Ventures, for its part, moves to dismiss the conversion claim for failure to state a claim, but also argues that it should be dismissed as a defendant pursuant to Fed. R. Civ. P. 12(b)(2) because it is not subject to the Court's personal jurisdiction.  "Where a Court is asked to rule on a combination of Rule 12 defenses, it will pass on the jurisdictional issues before considering whether

---

[3] On its face, this appears to be a claim on behalf of U3 Advisors (*i.e.*, a derivative claim).  The parties have not briefed this issue, however, and discussion of it is unnecessary to the Court's resolution of Defendants' motion to dismiss this claim.

a claim is stated in the complaint." *Koulkina v. City of New York*, 559 F. Supp. 2d 300, 310 (S.D.N.Y. Feb. 19, 2008) (citation omitted) (collecting cases); *see also Arrowsmith v. United Press Intern.*, 320 F.2d 219, 221 (2d Cir. 1963) (en banc) ("[L]ogic compel[s] initial consideration of the issue of jurisdiction over the defendant— a court without such jurisdiction lacks power to dismiss a complaint for failure to state a claim . . . ."); *Mende v. Milestone Tech., Inc.*, 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003) ("Before addressing Defendants' Rule 12(b)(6) motion to dismiss, the Court must first address the preliminary question[ ] of . . . personal jurisdiction."). Accordingly, the Court will first address U3 Ventures' objections to personal jurisdiction before turning to the sufficiency of the conversion claim asserted against it.

Rule 12(b)(2) of the Federal Rules of Civil Procedure authorizes motions to dismiss on the basis of lack of personal jurisdiction over a defendant. "On a Fed. R. Civ. P. 12(b)(2) motion to dismiss for lack of personal jurisdiction, plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003); *see also Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999) ("When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant."); *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 622 (S.D.N.Y. 2012) ("Once a defendant has raised a jurisdictional defense on a Rule 12(b) motion to dismiss, the plaintiff bears the burden of proving sufficient contacts with the relevant forum to establish jurisdiction over each defendant."). "In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167-68 (2d Cir. 2015) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013)). The plaintiff's prima facie showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *In re Terrorist*

*Attacks on September 11, 2011*, 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (internal quotation marks omitted)).  "In determining whether a plaintiff has met this burden, [a court] will not draw argumentative inferences in the plaintiff's favor, nor must [a court] accept as true a legal conclusion couched as a factual allegation." *Id.* (internal citations and quotation marks omitted).

"District courts resolving issues of personal jurisdiction must . . . engage in a two-part analysis.  First, they must determine whether there is jurisdiction over the defendant under the relevant forum state's laws . . . .  Second, they must determine whether an exercise of jurisdiction under these laws is consistent with federal due process requirements." *Bank Brussels Lambert*, 171 F.3d at 784.  "To establish personal jurisdiction over a defendant, due process requires a plaintiff to allege (1) that a defendant has 'certain minimum contacts' with the relevant forum, and (2) that the exercise of jurisdiction is reasonable in the circumstances." *In re Terrorist Attacks*, 714 F.3d at 673 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  "To determine whether a defendant has the necessary 'minimum contacts,' a distinction is made between 'specific' and 'general' personal jurisdiction." *Id.*  "A court may assert general jurisdiction over a foreign defendant to hear any and all claims against that defendant only when the defendant's affiliations with the State in which the suit is brought 'are so constant and pervasive so as to render it essentially at home in the forum State.'" *Waldman v. Palestinian Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) (quoting *Daimler AG v. Bauman*, 134 S. Ct. 746, 751 (2014)).  "Specific jurisdiction, on the other hand, depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and therefore subject to the State's regulation." *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

U3 Ventures argues that the exercise of general personal jurisdiction over it would be inappropriate because the complaint does not allege facts suggesting that it is "essentially at home"

in New York.  Def. Mem. at 23.  As to the exercise of specific personal jurisdiction, U3 Ventures argues that this would also be improper because any financial consequences suffered by Plaintiff in New York as a result of the alleged conversion of U3 Advisors' resources are irrelevant given that U3 Ventures did not perform any acts in New York.  *Id.* at 24-25.  In opposition, Plaintiff argues that the exercise of specific personal jurisdiction over U3 Ventures is warranted under N.Y. C.P.L.R. § 302(a)(2), because it committed a "tortious act within the state."  Pl. Opp at 24.  Plaintiff argues in the alternative that the Court can exercise jurisdiction under N.Y. C.P.L.R. § 302(a)(3)(ii), because U3 Ventures committed "a tortious act without the state causing injury to person or property within the state" and "should reasonably expect the act to have consequences in the state."  Pl. Opp. at 25. Plaintiff does not ask the Court to exercise general personal jurisdiction over U3 Ventures.

N.Y. C.P.L.R. § 302(a)(2) provides that "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . commits a tortious act within the state." Section 302(a)(3)(ii) provides that "a court may exercise personal over any non-domiciliary . . . who in person or through an agent . . . commits a tortious act without the state causing injury to person or property within the state . . . if he (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce."  "[P]hysical presence in New York is a prerequisite to jurisdiction under § 302(a)(2)" and this provision "reaches only tortious acts performed by a defendant who was physically present in New York when he performed the wrongful act."  *Bank Brussels Lambert*, 171 F.3d at 790 (citations omitted); *see also Bensusan Restaurant Corp. v. King*, 126 F.3d 25, 29 (2d Cir. 1997) (defendant or its agents must commit a tortious act while "physically present" in New York).  The complaint alleges only that U3 Ventures is a foreign corporation organized under the laws of Pennsylvania, Compl. ¶ 11, rendering the exercise of jurisdiction under § 302(a)(2) inappropriate based upon U3 Ventures' actual physical presence in New York.

As to whether Plaintiff has satisfied § 302(a)(2) based upon commission of the alleged tort through an agent, Plaintiff avers in an affidavit that Blaik and Lussenhop "devoted substantial time to and diverted [U3 Advisors'] employees (in both the Company's New York and Philadelphia offices) to perform . . . work for U3 Ventures . . . ."  Affidavit of Plaintiff Karen Backus in Opposition to Defendants' Motion to Dismiss the Amended Complaint (Dkt. No. 22) ¶ 7.  To establish jurisdiction on the basis of agency, a plaintiff "need not establish a formal agency relationship" between the defendants and those alleged to be acting on their behalf in New York; rather, a plaintiff "need only convince the court that [the alleged agent] engaged in purposeful activities in this State in relation to [the] transaction for the benefit of and with the knowledge and consent of the . . . defendants and that they exercised some control over [the alleged agent] in the matter."  *Kreutter v. McFadden Oil Corp.*, 522 N.E.2d 195, 199 (N.Y. 1988).  A plaintiff does need to establish, however, that the alleged agent was "physically present in New York when committing the act."  *Beach v. Citigroup Alt. Inv. LLC*, No. 12-cv-7717 (PKC), 2014 WL 904650, at *9 (S.D.N.Y. Mar. 7, 2014); *Overseas Media, Inc. v. Skvortsov*, 407 F. Supp. 2d 563, 572 (S.D.N.Y. 2006) ("[J]urisdiction under § 302(a)(2) will not be found where the plaintiff fails to allege that defendant or his agents committed a tortious act while physically present in New York . . . .") (quoting *Bensusan*, 126 F.3d at 29) (internal quotation marks and brackets omitted); *Kwon v. Yun*, No. 05-cv-1142 (GEL), 2006 WL 416375, at *7 (S.D.N.Y. Feb. 21, 2006) (section 302(a)(2) "only applies to tortious acts committed while the defendant (or his agent) is physically present within the state.") (citing *Bensusan*, 126 F.3d at 28).  Paragraph 7 of Plaintiff's affidavit attests to some nexus between the actions of Blaik and Lussenhop, the sole shareholders of U3 Ventures, and the state of New York.  But it falls short of establishing that either of them committed the alleged conversion while physically present in the state.[4]  Because physical presence is lacking here, so too is jurisdiction under § 302(a)(2).

---

[4] To the contrary, Plaintiff appears to concede that Blaik and Lussenhop committed the allegedly tortious acts while

Plaintiff has not satisfied § 302(a)(3)(ii) either.  To establish jurisdiction under that provision, a plaintiff must demonstrate that:

> (1) the defendant's tortious act was committed outside New York, (2) the cause of action arose from that act, (3) the tortious act caused an injury to a person or property in New York, (4) the defendant expected or should reasonably have expected that his or her action would have consequences in New York, and (5) the defendant derives substantial revenue from interstate or international commerce.

*Penguin Grp. (USA) Inc. v. Am. Buddha*, 640 F.3d 497, 499 (2d Cir. 2011) (citation omitted). Here, Plaintiff has not made any showing that U3 Ventures "derives substantial revenue from interstate or international commerce," and has therefore not shown that jurisdiction under § 302(a)(3)(ii) is proper.  Because Plaintiff has not satisfied her burden of showing that the Court has jurisdiction over U3 Ventures, its motion under Fed. R. Civ. P. 12(b)(2) is granted.

### 2.     Choice of Law on Conversion Claim

The parties dispute whether New York or Delaware law applies to Plaintiff's conversion claim.  Plaintiff asserts that New York law applies, while Defendants asserts that Delaware law applies.  As noted above, a federal court sitting in diversity applies the choice of law rules of the state in which it sits.  Under New York choice-of-law rules, "the first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved."  *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 382 (2d Cir. 2006) (quoting *In re Allstate Ins. Co. (Stolarz)*, 613 N.E.2d 936, 937 (N.Y. 1993)).  "If no actual conflict exists, and if New York is among the relevant jurisdictions, the court may simply apply New York law."  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012).  If, however, an actual conflict exists, then "[t]he law of the jurisdiction having the greatest interest in the litigation will be applied and the only facts or contacts which obtain significance in

---

physically present in Pennsylvania.  *See* Pl. Opp. at 8.

defining State interests are those which relate to the purpose of the particular law in conflict." *Schultz v. Boy Scouts of Am., Inc.*, 480 N.E.2d 679, 684 (N.Y. 1985) (quoting *Miller v. Miller*, 237 N.E.2d 877, 879 (N.Y. 1968)) (internal quotations and alterations omitted).  "Laws are in conflict where the applicable law from each jurisdiction provides different substantive rules."  *Int'l Bus. Mach. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004).

In tort law disputes, "interest analysis distinguishes between two sets of rules:  conduct-regulating rules and loss-allocating rules."  *Licci*, 672 F.3d at 158.  "If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders."  *Cooney v. Osgood Mach., Inc.*, 612 N.E.2d 277, 280 (N.Y. 1993).  Thus, "New York courts apply the law of the place where the tort occurred with regard to 'conduct regulating' rules."  *Rochford v. Woodloch Pines, Inc.*, 824 F. Supp. 2d 343, 349 (E.D.N.Y. 2011) (citing *Lee v. Bankers Trust Co.*, 166 F.3d 540, 545 (2d Cir. 1999)).  In this case, as explained below, the application of New York law is appropriate regardless of whether or not a conflict with Delaware's law on conversion exists.

If there was an actual conflict between the laws governing conversion claims in New York and Delaware, then the Court would undergo the required interest analysis.  This cause of action is "conduct regulating."  *See, e.g., Chigirinskiy v. Panchenkova*, No. 14-cv-4410 (JPO), 2015 WL 1454646, at *5 (S.D.N.Y. Mar. 31, 2015) ("Conversion is plainly a conduct-regulating tort."); *US Engine Prod., Inc. v. ISO Grp., Inc.*, No. 12-cv-4471 (JS) (GRB), 2013 WL 4500785, at *5 (E.D.N.Y. Aug. 20, 2013) (same).  As a result, the Court would apply the law of the state that has the most significant contacts with the tort.  *See Cooney*, 612 N.E.2d at 281 ("If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders.").  Here, the locus of the tort is New York, where Plaintiff resides, "as that is the locus of [her] economic loss."  *Grund v. Delaware Charter Guar.*

26

*& Trust Co.*, 788 F. Supp. 2d 226, 244 (S.D.N.Y. 2011) (citing *In re Currency Conversion Fee Antitrust Litig.,* 230 F.R.D. 303, 311 (S.D.N.Y. 2004)).  If an actual conflict existed, therefore, the Court would apply New York's law on conversion.  In the alternative, if there were no actual conflict between the laws of New York and Delaware with respect to conversion, the Court would also apply New York law.  *See Licci,* 672 F.3d at 157; *Int'l Bus. Mach.,* 363 F.3d at 143.  Accordingly, whether or not there is a conflict between New York and Delaware law on conversion, the Court would apply New York law.  The Court need not, therefore, assess whether a conflict exists, and will apply New York law in adjudicating Defendants' motion to dismiss Plaintiff's conversion claim.

### 3.      Analysis of Conversion Claim under New York Law

Under New York law, "[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Thyroff v. Nationwide Mut. Ins. Co.,* 460 F.3d 400, 403 (2d Cir. 2006) (quoting *Vigilant Ins. Co. of Am. v. Hous. Auth.,* 660 N.E.2d 1121, 1126 (N.Y. 1995)).  To state a claim for conversion, a plaintiff must allege "(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *Kirschner v. Bennett,* 648 F. Supp. 2d 525, 540 (S.D.N.Y. Aug. 25, 2009) (quoting *Moses v. Martin,* 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004)).  New York law requires a plaintiff to plead the exercise of "unauthorized dominion" over "specific and identifiable property." *Walden Terrace, Inc. v. Broadwall Mgmgt. Corp.,* 213 A.D.2d 630, 631 (2d Dep't 1995); *see also Messiah's Covenant Comm. Church v. Weinbaum,* 74 A.D.3d 916, 919 (2d Dep't 2010) ("[T]he plaintiff must show legal ownership or an immediate superior right of possession to a specific identifiable thing . . . .").

In this case, the crux of Plaintiff's conversion claim is that Defendants "wrongfully diverted U3 Advisors' resources" by directing employees of the company to perform work for the benefit of

U3 Ventures.  The "resources" of U3 Advisors, however, are not identified in the complaint and the Court cannot conclude that these resources are the kind of tangible, specific property upon which a conversion claim may permissibly be based under New York law.  Nor does Plaintiff's ascription of a monetary value to the hours worked by employees of U3 Advisors for the benefit of U3 Ventures transform the allegedly diverted resources into the kind of specific, identifiable property necessary to sustain a conversion claim.  Under New York law, "an action will lie for conversion of money where there is a specific, identifiable fund, and an obligation to return or otherwise treat in a particular manner the specific fund in question."  *Manufacturers Hanover Trust Co. v. Chemical Bank*, 160 A.D.2d 113 (1st Dep't 1990); *see also Ehrlich v. Howe*, 848 F. Supp. 482, 492 (S.D.N.Y. 1994) ("An action for conversion of money is insufficient as a matter of law unless it is alleged that the money converted was in specific tangible funds of which claimant was the owner and entitled to immediate possession."); *Auguston v. Spry*, 282 A.D.2d 489, 491 (2d Dep't 2001) (commingled money is "incapable of being converted").  Plaintiff does not seek the return of money that could be described or identified as a specific chattel or a specific, identifiable fund.  Count Four of the complaint, alleging conversion against Blaik and Lussenhop, is dismissed with prejudice.[5]

### D.  Breach of Stockholder Agreement against Blaik and Lussenhop (Count Two)

Count Two of the complaint alleges that Blaik and Lussenhop breached the Stockholder Agreement, "including but not limited to" its Article 6(a) which, as noted above, provides:

> The Stockholders hereby acknowledge that for at least two years following the Effective Date, all of the Principals are expected to be "Active Principals", meaning that each of them is expected to devote substantially all of their professional time to the Company, and to be involved in the day-to-day business operations and management of the Company.

Plaintiff alleges that Blaik breached the Stockholder Agreement "by devoting substantial

---

[5] Although this claim is also brought against U3 Ventures, that company is dismissed from this case for lack of personal jurisdiction, as discussed above.

time during 2014 and 2015 to the operation of U3 Ventures, as its sole owner at that time, rather

than to U3 Advisors," and that Lussenhop breached "by devoting approximately 24% of his time to

U3 Ventures during 2014 and 2015, rather than to U3 Advisors." Compl. ¶¶ 62-63. By contrast,

during 2014 and 2015, Plaintiff "devoted her full attention and efforts to U3 Advisors and

successfully generated revenues of $1,845,594 in 2014 and $2,021,747 in 2015." *Id.* ¶ 64. The

complaint alleges that, as a result of Blaik and Lussenhop's breaches of the Stockholder Agreement,

Plaintiff "sustained and will continue to sustain damages as a direct result of [their] refusal to devote

their time as required under the Stockholder Agreement to the revenue growth of U3 Advisors." *Id.*

¶ 65. Plaintiff estimates that damages incurred thus far exceed $900,000. *Id.* ¶ 66. Plaintiff asserts

this claim on behalf of herself (*i.e.* directly) and not on behalf of U3 Advisors (*i.e.*, derivatively). *See*

*id.* ¶ 65 ("As a result of Blaik and Lussenhop's breach of the Stockholder Agreement, Backus

sustained and will continue to sustain damages . . . .").

Defendants seek dismissal of this claim on two bases. First, they argue that Plaintiff

improperly pleads this as a direct claim, when it must be pleaded as a derivative claim, and that she

has not complied with the procedural requirements for bringing a derivative claim. Def. Mem. at 18.

Second, they assert that the claim fails on the merits because Plaintiff fails to allege "compensable

injury resulting from the alleged breach of the Stockholder Agreement." *Id.* at 20.

### 1. Damages

With respect to damages, Defendants argue that this breach of contract claim should be

dismissed because the complaint "does not assert any facts to indicate that Blaik's or Lussenhop's

alleged work for U3 Ventures harmed Backus – or even the Company in any way." *Id.* at 21.

"Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a

breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff." *H-M Wexford*

*LLC v. Encorp., Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003); *see also Connelly v. State Farm Mut. Auto. Ins.*

*Co.*, 135 A.3d 1271, 1279 n.28 (Del. 2016) (citing *H-M Wexford*, 832 A.2d at 140).  Defendants argue that this claim should be dismissed because it is "not tied to any damages" and only alleges "general harm in conclusory terms."  Def. Mem. at 21-22.  The Court disagrees.  As recounted above, the complaint alleges that Blaik and Lussenhop are required under Article 6(a) of the Stockholder Agreement to devote substantially all of their professional time to U3 Advisors, but that they failed to do so.  It also alleges that Plaintiff, who did devote such time to the company, generated certain revenues.  It is certainly plausible that the alleged failure of Blaik and Lussenhop to devote substantially all of their professional time to the U3 Advisors resulted in the generation of lesser revenues than would have been generated had they devoted more time to the company.  Dismissal of Count Two for failure to allege damages is not warranted.

### 2.   Direct vs. Derivative Claims

Defendants' second argument for dismissal of Count Two is that this claim may only be brought derivatively on behalf of U3 Advisors, and that Plaintiff has not satisfied the procedural requirements for bringing a derivative claim.  The Court concludes that this claim must be asserted derivatively and, as a result, considers next whether Plaintiff has met the requirements for the prosecution of derivative claims imposed by Fed. R. Civ. P. 23.1.  As explained below, the Court finds that Plaintiff has not satisfied those requirements.

### a.  Whether Count Two is Direct or Derivative in Nature

In the seminal case of *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, the Delaware Supreme Court established the analysis to be applied in determining whether a shareholder's claim is derivative of direct.  According to the court, "[t]hat issue must turn *solely* on the following questions:  (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"  845 A.2d 1031, 1033 (Del. 2004 (emphasis in original).  The court further explained

that

> a court should look to the nature of the wrong and to whom the relief should go. The stockholder's claimed direct injury must be independent of any alleged injury to the corporation.  The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.

*Id.* at 1039; *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1260 (Del. 2016) (same).

In this case, Plaintiff alleges that Blaik and Lussenhop breached a contractual duty—*i.e.*, the obligation in Article 6(a) of the Stockholder Agreement to devote substantially all of their professional time to U3 Advisors.  Plaintiff asserts that the Stockholder Agreement was "signed by the parties to this claim (Backus, Blaik and Lussenhop) in their individual capacities, in addition to being signed by Backus and Blaik as the Company's Co-CEOs," and that "Blaik and Lussenhop each owed Backus individually a duty" under Article 6(a).  Pl. Opp. at 21.  Plaintiff argues that, in light of this duty owed to her "individually," she may bring this claim directly.  This position is not supported by the applicable case law.

In *El Paso*, the Delaware Supreme Court acknowledged its holding in *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.* that "a suit by a party to a commercial contract to enforce its own contractual rights is not a derivative action under Delaware law."  152 A.3d at 1259 (quoting *NAF Holdings*, 118 A.3d 175, 182 (Del. 2015)).  In *NAF Holdings*, the court explained that *Tooley* and its progeny "deal with the . . . question of when a cause of action for breach of fiduciary duty or to enforce rights belonging to the corporation itself must be asserted derivatively" and that this "body of law has no bearing on whether a party with its own rights as a signatory to a commercial contract may sue directly to enforce those rights."  118 A.3d at 176.  In *El Paso*, however, the court clarified that "*NAF Holdings* does not support the proposition that *any* claim sounding in contract is direct by default, irrespective of *Tooley*" and that when a claim "sounds in breach of a contractual duty" owed to the company, the *Tooley* analysis applies to determine whether the claim "must be asserted

derivatively or is dual in nature such that it can proceed directly." 152 A.3d at 1259-60.

In this case, while Plaintiff asserts a contractual claim, that claim sounds in breach of a contractual duty owed to U3 Advisors. Although Plaintiff pleads this claim as having damaged her directly, Compl. ¶ 65, the essence of her claim is that Blaik and Lussenhop have failed to devote the required time "to the revenue growth of U3 Advisors." *See id.* Accordingly, the Court will apply the *Tooley* analysis to determine whether Plaintiff may proceed with this claim directly, or whether she must bring it derivatively on behalf of U3 Advisors.

Applying the first prong of *Tooley*, it is apparent that the complaint alleges injury to Plaintiff only in terms of the alleged harm to U3 Advisors. Plaintiff's theory of harm is that, by virtue of Blaik and Lussenhop's alleged failure to devote substantially all of their professional time to U3 Advisors, the revenue growth of U3 Advisors has been impeded. Thus, "[a]ny economic harm to [Plaintiff] devolved upon [her] as an equity holder in the form of proportionally reduced value of [her] units – a classically derivative injury." *El Paso*, 152 A.3d at 1261; *see also Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008) ("Where all of a corporation's stockholders are harmed and would recover *pro rata* in proportion with their ownership of the corporation's stock solely because they are stockholders, then the claim is derivative in nature."). As to the second prong of *Tooley*, it is equally clear that the benefit of any recovery on this claim must flow solely to U3 Advisors. "Were [Plaintiff] to recover directly for the alleged decrease in the value" of U3 Advisors as a result of the alleged breach of the Stockholder Agreement by Blaik and Lussenhop, "the damages would be proportionate to [her] ownership interest," and the "necessity of a *pro rata* recovery to remedy the alleged harm indicates that [her] claim is derivative." *El Paso*, 152 A.3d at 1264.

Plaintiff relies upon *Rhodes v. Silkroad Equity, LLC*, 2007 WL 2058736 (Del. Ch. July 11, 2017), in arguing that she can proceed with this claim directly. In *Rhodes*, the Court of Chancery reasoned that there are "circumstances which may form the basis for both direct claims and

derivative claims" in which "[a]lthough the corporation may be harmed," the "consequences of that harm fall disproportionately upon minority stockholders." *Id.* at *5. *Rhodes* relied upon the Delaware Supreme Court's holding in *Gentile v. Rossette* that "[t]here is . . . at least one transactional paradigm – a species of corporate overpayment claim – that Delaware law recognizes as being both derivative and direct in character." 906 A.2d 91, 99-100 (Del. 2006). That paradigm, characterized as having a "dual character," is a breach of fiduciary duty claim where "(1) a stockholder having majority or effective control causes the corporation to issue 'excessive' shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders." *Id.* at 100. *Gentile*, unlike this case, "concerned a controlling shareholder and transactions that resulted in an improper transfer of both economic value *and* voting power from the minority stockholders to the controlling stockholder." *El Paso*, 152 A.3d at 1264 (emphasis in original). Plaintiff's claim does not satisfy the "unique circumstances" presented by "the *Gentile* species of corporate overpayment claims." *Id.* (quoting *Gentile*, 906 A.2d at 99) (internal quotation marks omitted); *see also Dietrichson v. Knott*, 2017 WL 1400552, at *5 (Del. Ch. Apr. 19, 2017) (finding claims not to be "dual-natured" under *Gentile* where plaintiff did not "allege any dilution of voting power"). The Court concludes, therefore, that Count Two of the complaint asserts a claim which must be asserted derivatively on behalf of U3 Advisors, and which Plaintiff cannot pursue directly.

### b. Demand under Fed. R. Civ. P. 23.1

Having concluded that Count Two must be asserted derivatively on behalf of U3 Advisors, the Court must determine whether Plaintiff has complied with the requirements of Fed. R. Civ. P. 23.1. Rule 23.1 outlines the requirements that apply when "one or more shareholders of a corporation . . . bring a derivative action to enforce a right that the corporation or association may

properly assert but has failed to enforce." Fed. R. Civ. P. 23.1(a).  Among other prerequisites, a derivative complaint must "state with particularity:  (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority, and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort."  Fed. R. Civ. P. 23.1(b)(3)(A)-(B).

Defendants argue that Plaintiff "has not even attempted to comply with the procedural requirements to bring this claim derivatively" because the complaint "does not allege that she made a demand for Blaik and Lussenhop to increase their time working for the Company, nor does it state with particularity the reasons for making such a demand."  Def. Mem. at 20.  Plaintiff's opposition relies on the allegations regarding demand and demand futility in the complaint.  Pl. Opp. at 22-23.  As discussed below, the substance of the demand requirement imposed by Fed. R. Civ. P. 23.1 is supplied by Delaware law, and Plaintiff has failed to satisfy that requirement.

"Although Rule 23.1 sets forth the pleading standard for federal court, the substance of the demand requirement is a function of state law—here, Delaware law."  *Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*, 797 F.3d 229, 234 (2d Cir. 2015).  Delaware law requires that a plaintiff plead that she "demanded that the directors pursue the corporate claim and the directors have wrongfully refused to do so."  *Wood v. Baum*, 953 A.3d 136, 140 (Del. 2008); *see also Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004) ("[A] stockholder may not pursue a derivative suit to assert a claim of the corporation unless . . . she has first demanded that the directors pursue the corporate claim and they have wrongfully refused to do so . . . ."); *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993) ("[T]he right of a stockholder to prosecute a derivative suit is limited to situations where the stockholder has demanded that the directors pursue the corporate claim and they have wrongfully refused to do so . . . .").  Plaintiff's allegation that she "made more than sufficient demand . . . because she has sought reimbursement for the depletion and diversion of

U3 Advisors' assets," Compl. ¶ 48, clearly does not satisfy the demand requirement because Plaintiff does not allege that she demanded that the board of U3 Advisors pursue her claim. The Court notes that Defendants also misunderstand the demand requirement under Delaware law insofar as they argue that Plaintiff failed to demand that Blaik and Lussenhop "increase their time working for" U3 Advisors. Def. Mem. at 20. As reflected in the case law cited above, the demand that a Plaintiff pursuing a derivative action must make is not a demand that the parties in question cease the alleged offending conduct, but a demand that the board of directors pursue the corporate claim asserted by the would-be derivative plaintiff.

Although the Court cannot conclude that Plaintiff has made an adequate demand, this does not end the matter, as she also pursues a theory of demand futility. Compl. ¶¶ 50-51 (alleging that demand is excused as "futile" because "U3 Advisors did not have an independent and disinterested Board of Directors"). "A shareholder plaintiff who does not make a demand on the board must allege that demand is excused." *F5 Capital v. Pappas*, 856 F.3d 61, 82 (2d Cir. 2017). "The substantive law which determines whether demand is, in fact, futile is provided by the state of incorporation of the entity on whose behalf the plaintiff is seeking relief." *Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 138 (2d Cir. 2004). The Court will therefore look to Delaware law regarding demand excusal, as it did when assessing whether Plaintiff's asserted "demand" was adequate. To plead demand excusal under Delaware law, "a plaintiff in a derivative action must plead particularized facts creating a 'reasonable doubt' that either (1) the directors are disinterested and independent or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Del. Cnty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1020 (Del. 2015) (citation and internal quotation marks omitted); *see also Braddock v. Zimmerman*, 906 A.2d 776, 784 (Del. 2006) ("[D]emand will be excused if the derivative complaint pleads particularized facts creating a reasonable doubt that . . . the directors are disinterested and independent . . . .").

Plaintiff pursues a theory of lack of director disinterestedness and independence, alleging in the complaint that "[d]ecisions were made by the stockholders" (*i.e.*, Blaik, Backus and Lussenhop) and that "Blaik and Lussenhop were the only stockholders in U3 Advisors other than Backus and were interested parties as owners of U3 Ventures and beneficiaries of the diversion." Compl. ¶ 51. Blaik held a 48% interest in the company until August 2016, when his interest increased to 60% through the acquisition of Lussenhop's 12% interest. *Id.* The Court concludes that Plaintiff has not adequately pleaded demand futility. As the governing test makes clear, a plaintiff's pleading must raise reasonable doubt as to the disinterestedness and independence of the *directors* of the company. Plaintiff has not identified the members of the board of directors of U3 Advisors at the time that she alleges demand would have been futile; the Court cannot as a result assess whether Plaintiff's pleading raises a reasonable doubt as to the disinterestedness and independence of the directors. The complaint's vague allegation that "decisions were made by the stockholders," Compl. ¶ 51, is insufficient to meet this burden, and Count Two, alleging breach of the Stockholder Agreement by Blaik and Lussenhop, must be dismissed without prejudice.

### E.  Corporate Waste (Count Three)

Count Three of the complaint alleges "diversion and waste of U3 Advisors' assets" against Blaik and Lussenhop. The complaint alleges that in their respective capacities as Chief Executive Officer and Senior Vice President of U3 Advisors, Blaik and Lussenhop "improperly diverted the resources of U3 Advisors by directing its employees to perform work and services for U3 Ventures from 2014 to 2016." *Id.* ¶ 72. These actions were "not authorized at any time by the Board of Directors of U3 Advisors" and "caused the improper depletion and waste of U3 Advisors' resources." *Id.* ¶ 73. They were "solely for the purpose of benefitting their respective interests in U3 Ventures, without regard to the consequences or detriment of U3 Advisors, and without any corresponding benefit to U3 Advisors," and "result[ed] in an exchange so one-sided that no person

36

of ordinary, sound judgment could conclude that U3 Advisors received adequate consideration." *Id.* ¶ 74.

Defendants, in seeking dismissal of this claim, "do not concede" that Plaintiff can pursue this claim directly, but assert that the matter is "academic" because the claim fails on the merits. Def. Mem. at 14, n. 6. Defendants' primary argument for dismissal is that Plaintiff has not pleaded facts that meet the "stringent standard" for corporate waste because "she alleges facts that are consistent with the perfectly normal practice of shared employees who are compensated by both the Company and U3 Ventures for their work for the respective businesses." Def. Mem. at 18. Defendants also assert that Plaintiff "has not even alleged that U3 Ventures failed to compensate the named employees for their work." *Id.* Plaintiff's opposition argues that the employees directed to perform work for U3 Ventures were "acting within the scope of their employment *for [U3 Advisors]*" at the relevant times. Pl. Opp. at 20 (emphasis in original).

Under Delaware law, pleading a claim for corporate waste requires a plaintiff to allege facts demonstrating "an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000) (citation and internal quotation marks omitted); *see also Seinfeld v. Slager*, 2012 WL 2501105, at *3 (Del. Ch. June 29, 2012). The test for corporate waste under Delaware law imposes "stringent requirements," *Brehm*, 746 A.2d at 263, and a "plaintiff faces an uphill battle in bringing a waste claim." *Seinfeld*, 2012 WL 2501105, at *3. The waste standard is "an extreme test, very rarely satisfied by a shareholder plaintiff, because if under the circumstances any reasonable person might conclude that the deal made sense, then the judicial inquiry ends." *Id.* at *3 (quoting *Zupnick v. Goizueta,* 698 A.2d 384, 387 (Del. Ch. 1997)) (internal quotation marks omitted).

The Court concludes that the complaint fails to meet the stringent standard required to state a claim for waste. While Plaintiff's opposition asserts that the employees who performed work for

U3 Ventures performed this work while acting within the scope of their employment for U3 Advisors, the complaint itself does not contain such an allegation.  Nor does the complaint allege facts supporting a plausible inference that Blaik and Lussenhop essentially directed these employees to work for U3 Ventures while collecting compensation from U3 Advisors for those very same hours, nor that U3 Ventures failed to pay them for the hours worked.  As a result, the Court cannot conclude that Plaintiff has pleaded facts showing an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration, and Count Three of the complaint is dismissed without prejudice.

### F.  Breach of Fiduciary Duty (Count Six)

Count Six of the complaint alleges that Blaik and Lussenhop, as the CEO and Senior Vice President of U3 Advisors, respectively, each "owed a fiduciary duty to Backus as a shareholder to act with the utmost good faith, honestly and loyalty toward U3 Advisors and Backus and to not favor or promote his own-self interests over U3 Advisors."  Compl. ¶¶ 95-96.  The complaint further alleges that Blaik and Lussenhop, in directing employees of U3 Advisors to perform work for U3 Ventures, breached a fiduciary duty owed to U3 Advisors and to Plaintiff.  *Id.* ¶¶ 101-02.

Plaintiff maintains that she can pursue this cause of action as a direct claim because Blaik and Lussenhop's actions "had the true substantive effect of harming Backus, as a minority shareholder and as the only other shareholder in U3 Advisors . . . in a substantially different fashion from Blaik and Lussenhop."  *Id.* ¶ 105.  As with Plaintiff's corporate waste claim, Defendants argue that this claim fails on the merits, and they therefore do not address whether Plaintiff has properly pleaded this claim as a direct claim.  Def. Mem. at 14, n.6.  Defendants' arguments in favor of dismissal of this claim are essentially the same as those they advance in seeking dismissal of Plaintiff's corporate waste claim; Plaintiff similarly opposes Defendants' motion on the same bases as those on which she opposes dismissal of her waste claim.

"Directors of Delaware corporations owe two fiduciary duties:  the duty of care and the duty of loyalty."  *McKenna v. Singer*, 2017 WL 3500241, at *15 (Del. Ch. July 31, 2017) (citing *Auriga Capital Corp. v. Gatz Props.*, 40 A.3d 839, 851 (Del. 2012)).  "[C]orporate officers," moreover, "owe fiduciary duties that are identical to those owed by corporate directors."  *Gantler v. Stephens*, 965 A.2d 695, 708 (2009); *see also Frederik Hsu Living Tr. v. ODN Holding Corp.*, 2017 WL 1437308, at *39 (Del. Ch. Apr. 14, 2017) (same).  "A claim for breach of fiduciary duty requires proof of two elements:  (1) that a fiduciary duty existed and (2) that the defendant breached that duty."  *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010).

In this case, the existence of fiduciary duties on the part of Blaik and Lussenhop does not appear to be in dispute; indeed, as corporate officers, it is clear that they owe fiduciary duties of care and loyalty just like corporate directors.  The duty of loyalty, which Plaintiff alleges Blaik and Lussenhop have violated, has "consistently [been] defined" in "broad and unyielding terms" by the Delaware Supreme Court, as follows:

> Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests . . . A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers.  The rule that requires an undivided and unselfish loyalty to the corporation demands that there be no conflict between duty and self-interest.

*Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) (quoting *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (1939)).  "Essentially, the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."  *Id.; see also In re Mobilactive Media, LLC*, 2013 WL 297950, at *21 (Del. Ch. Jan. 25, 2013) ("At the core of the fiduciary duty is the notion of

loyalty—the equitable requirement that, with respect to the property subject to the duty, a fiduciary always must act in a good faith effort to advance the interests of his beneficiary.") (quoting *Dweck v. Nasser,* 2012 WL 161590, at *12 (Del. Ch. Jan. 18, 2012)).  "The duty of loyalty includes a requirement to act in good faith, which is 'a subsidiary element, *i.e.*, a condition, of the fundamental duty of loyalty.'"  *Frederick Hsu Living Tr.*, 2017 WL 1437308, at *16 (quoting *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006)).  "A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation . . . ."  *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006).

Although the Court has concluded that the allegations in the complaint were insufficient to meet the stringent standard applicable to claims of corporate waste under Delaware law, those allegations do raise the specter that Blaik and Lussenhop have acted with a purpose other than advancing the best interests of U3 Advisors.  The allegations in the complaint permit a plausible inference that Blaik and Lussenhop have exploited their positions as officers of U3 Advisors with the ability to direct its employees to further their private interests as members of U3 Ventures.  Count Six of the complaint, alleging breach of fiduciary duty against Blaik and Lussenhop, is therefore denied on the ground asserted—namely, that Plaintiff has failed to state a claim for breach of fiduciary duty.  The Court, however, has significant questions about whether this claim can be brought directly, or must instead be brought derivatively.  Because the parties have not briefed this issue that could affect viability of this claim as pleaded in the complaint, the Court directs the submission of supplemental briefing on this topic, as explained further below.

## IV.    CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is GRANTED in part and DENIED in part.

In this circuit, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to

replead." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *see also* Fed. R. Civ. P.

15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). Accordingly,

the Court grants Plaintiff leave to amend the complaint to address the deficiencies identified in this

opinion—except as to Counts One, Four and Seven, which are being dismissed with prejudice.

With respect to those claims, the Court has evaluated whether amendment to cure the deficiencies

identified in this opinion would be futile, and determined that it would be. *See, e.g.*, *Ellis v. Chao*, 336

F.3d 114, 127 (2d Cir. 2003) ("[I]t is well established that leave to amend a complaint need not be

granted when amendment would be futile."). Any amended complaint must be filed no later than 30

days from the date of this order.

Defendants are directed to submit a supplemental brief of no more than ten pages on the

issue of whether Count Six can proceed as a direct claim, or must instead be brought as a derivative

claim. This supplemental brief is due no later than 21 days after (i) service of an amended complaint

or (ii) expiration of the 30 day period in which Plaintiff may file an amended complaint, whichever is

earlier. Plaintiff may file a responsive brief of no more than ten pages, within two weeks of service

of Defendants' brief. Defendants' reply, if any, is due one week from the date of service of

Plaintiff's opposition, and is to be no more than five pages in length.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 19.

SO ORDERED.

Dated:  August 18, 2017
New York, New York

_____
GREGORY H. WOODS
United States District Judge